**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

ABBVIE INC. (a Delaware corporation);
ALLERGAN, INC. (a Delaware corporation);
DURATA THERAPEUTICS, INC. (a
Delaware corporation); ABBVIE PRODUCTS
LLC (a Georgia limited liability company);
APTALIS PHARMA US, INC. (a Delaware
corporation); PHARMACYCLICS LLC (a
Delaware limited liability company);
ALLERGAN SALES, LLC (a Delaware
limited liability company),

                    *Plaintiffs*,

          v.

KRIS KOBACH, in his official capacity
as the ATTORNEY GENERAL OF THE
STATE OF KANSAS,

                    *Defendant*.

Case No. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs AbbVie Inc., Allergan, Inc., Durata Therapeutics, Inc., AbbVie Products LLC,

Aptalis Pharma US, Inc., Pharmacyclics LLC, Allergan Sales, LLC (collectively "AbbVie" or

"Plaintiffs"), by and through their undersigned attorneys, bring this action for declaratory and

injunctive relief against the Attorney General of the State of Kansas challenging the

constitutionality of the portion of S.B. 28 that authorizes "expenditures . . . be made . . . to enforce

the laws of the Kansas consumer protection act [sic] against a manufacturer who" seeks to "deny,

restrict, prohibit or otherwise interfere with the acquisition of a 340B drug by or delivery of a 340B

drug to a pharmacy that is under contract with a 340B-covered entity and authorized under such

contract to receive and dispense 340B drugs on behalf of the 340Bcovered [sic] entity."  S.B. 28, §§ 32 (g)(1), (2); 33 (2023).  In support, AbbVie alleges as follows:

## PRELIMINARY STATEMENT

1.      AbbVie brings this lawsuit to challenge the constitutionality of S.B. 28.  Kansas' statute effects an unconstitutional taking under the United States Constitution, violates the supremacy of United States federal laws by impermissibly adding state-law requirements for participating in the federal drug discount program established under Section 340B of the Public Health Service Act (the "340B statute"), and violates the Due Process Clause of the United States Constitution, as well as the Due Process Clause of the Kansas Constitution.  S.B. 28 also violates the Kansas Constitution's "one-subject rule," by seeking to regulate more than one subject within the same legislation.  Kan. Const. art. 2, § 16.

2.      The federal 340B statute establishes a comprehensive program that is designed to help uninsured and low-income patients gain better access to prescription medications at discounted prices.  As a condition of participating in the federal Medicaid program, pharmaceutical manufacturers must offer their covered outpatient drugs at deeply discounted prices to an enumerated list of "covered entities"—certain registered and specially identified safety net hospitals and clinics—that are expected to serve vulnerable patient populations.  *See* 42 U.S.C. § 256b(a)(4).  Federal law thus imposes an obligation on manufacturers to provide their drugs at 340B discounted prices to certain specified covered entities in exchange for the federal government's commitment to subsidize Medicaid beneficiaries' drug expenses.  Contract pharmacies are not mentioned in—let alone required by—the federal 340B statute.

3.      The federal statute grants the Secretary of the U.S. Department of Health and Human Services ("HHS") exclusive authority to enforce its provisions.  *See* 42 U.S.C. § 256b(d).

The statute leaves no role for states or other third parties to change the requirements of the federal 340B program or the conditions it imposes on manufacturers in return for participating in Medicaid.  Nor do states or other third parties have any authority to enforce the federal statute's requirements.  The Supreme Court has held that third-party enforcement "would undermine the agency's efforts to administer" the 340B program and other related federal programs "harmoniously and uniformly."  *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 119–20 (2011).

4.      Because forcing manufacturers to transfer their drugs at discounted prices to covered entities raises serious constitutional concerns, Congress carefully limited the program to ensure that manufacturers' discounted drugs would be used to help needy patients, and enacted certain safeguards to prevent the program from being abused for the benefit of other private parties. For example, in a statutory provision designed to prevent "diversion," Congress made clear that covered entities are not allowed to transfer manufacturers' drugs to anyone other than their own patients, prohibiting other entities from either participating in the 340B program or profiting from the sale of manufacturers' drugs at the 340B discounted price.  *See* 42 U.S.C. § 256b(a)(5)(B).

5.      Nevertheless, over the last decade covered entities have entered into novel contractual arrangements with commercial pharmacies (called "contract pharmacies") that have allowed those pharmacies to profit from the sale of manufacturers' drugs.  Instead of serving the covered entities' uninsured and low-income patients, the for-profit contract pharmacies acquire manufacturers' drugs at the federally discounted price, sell them to patients (including indigent patients) at full price, and pocket the difference.  Contract pharmacies accomplish this arbitrage through a complicated accounting system known as the "replenishment model," described in more detail below.  The bottom-line result is that for-profit commercial pharmacies and the covered

entities they contract with are able to pocket billions of dollars every year, splitting the profits at the expense of both manufacturers and the needy patients who are supposed to be served by the federal 340B program.

6.     Neither contract pharmacies nor the replenishment model are features of the ordinary commercial drug-distribution system in the United States, outside the 340B context, where they are unauthorized by statute.  AbbVie is involved in no other commercial arrangement using contract pharmacies or the replenishment model.  Contract pharmacies and the replenishment model are creatures only of the federal 340B drug discount arbitrage regime.

7.     In response to these abuses, manufacturers (including AbbVie) have adopted policies that limit when they will sell or facilitate the transfer of drugs at the 340B discounted price to third-party commercial pharmacies.  These policies recognize that the federal statute requires only that manufacturers "offer" their drugs at discounted prices to the covered entities *themselves*. There is no additional requirement that manufacturers provide the drugs to whomever and wherever the covered entities may demand, and there is certainly no requirement that manufacturers allow commercial pharmacies to *profit* from the sale of their drugs at discounted prices under the federal 340B program.

8.     Manufacturers' decisions to address these abuses resulted in litigation between manufacturers and the U.S. Department of Health and Human Services and, in early 2023, the U.S. Court of Appeals for the Third Circuit confirmed that the manufacturers' policies are lawful and permitted under federal law.  Congress required manufacturers to offer their covered outpatient drugs at discounted prices in return for participating in Medicaid; it did not impose any additional obligation on manufacturers to provide their drugs to third-party commercial pharmacies, or to otherwise support arbitrage of their charitable discounts.  Commercial pharmacies are not covered

entities, and they are not entitled to benefit from the federal 340B program or access manufacturers' drugs at the 340B discounted price.  *See Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Hum. Servs.*, 58 F.4th 696 (3d Cir. 2023).

9.     The United States Court of Appeals for the District of Columbia Circuit recently agreed with the Third Circuit's conclusion, holding that because "section 340B merely requires manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount," the statute gives manufacturers freedom "to impose at least some delivery conditions." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024).  And because conditions such as limiting delivery to "a single contract pharmacy designated by the covered entity" in no way impair a manufacturer's offer to sell drugs at the 340B discounted price, the restrictions fall within the ambit of freedom manufacturers enjoy under the federal 340B statute.  *Id.* at 462–64.

10.     Numerous states, including Kansas, participated in the Third Circuit case as an *amicus curiae*, on the losing side.  After that loss, the Kansas Legislature began considering the language that eventually became S.B. 28, which attempts to impose requirements under the federal 340B statute that Congress chose not to impose.

11.     In particular, S.B. 28 seeks to change the requirements of when and to which entities manufacturers must provide 340B discounted drugs as a condition of participating in Medicaid.  *See* S.B. 28, §§ 32(g), 33.  Without defining "interference," S.B. 28 broadly prohibits manufacturers and distributors from "interfer[ing] with a pharmacy that has a contract with a 340B-covered entity."  S.B. 28, §§ 32 (g)(1)(B), 33.  It further prohibits manufacturers and distributors from "deny[ing], restrict[ing], prohibit[ing] or otherwise interfer[ing] with the acquisition of a 340B drug by or delivery of a 340B drug to a pharmacy that is under contract . . . to receive and dispense 340B drugs on behalf of the 340Bcovered [sic] entity, unless such receipt and dispensing

of 340B drugs by such pharmacy is prohibited by the United States department of health and human services [sic]." *Id.* at (g)(1)(A).

12.     S.B. 28 violates the United States Constitution and should be enjoined.

13.     ***First***, S.B. 28 deprives manufacturers of property without due process of law and results in an impermissible taking under the Fifth Amendment.   Under the Fifth Amendment, neither the federal government nor the states have any authority to force A-to-B transfers of private property for the benefit of private parties.  *See Kelo v. City of New London*, 545 U.S. 469, 477 (2005) (explaining that "the sovereign may not take the property of A for the sole purpose of transferring it to another private party B, even though A is paid just compensation").   The federal government has defended the federal 340B statute on grounds that manufacturers are not being *forced* to transfer their property to for-profit pharmacies, but instead supposedly agreed to do so at the request of covered entities "voluntarily" in exchange for the benefit of participation in the federal Medicaid program.

14.     Kansas, however, purports to directly require manufacturers to transfer their property to other private entities if those entities have *third-party* contracts that purport to allow them to access AbbVie's drugs at deep discounts.  Kansas has no authority to take private property for private use, and no authority to deprive AbbVie of its property without due process of law.  By seeking to change the requirements for when drug manufacturers must provide 340B price drugs to contract pharmacies at the request of covered entities, the statute unlawfully appropriates private property for the private benefit of commercial pharmacies and does so without serving any valid public purpose.  *See Horne v. Dep't of Agric.*, 576 U.S. 350, 370 (2015) (holding government's confiscation of portion of farmers' raisin crop for charitable or other purpose without just compensation was a *per se* taking).

15.     **Second**, even if it S.B. 28 does not effect an unconstitutional taking, it is preempted by federal law under the Supremacy Clause.  The doctrine of federal preemption requires that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Remund v. State Farm Fire & Cas. Co.*, 483 F. App'x 403, 7 (10th Cir. 2012) (quoting *Felder v. Casey*, 487 U.S. 131, 138 (1988)).  By seeking to change the requirements of when and to which entities manufacturers must offer drugs at a discounted price as a condition of participating in the federal Medicaid program, S.B. 28 unlawfully modifies the requirements of the federal 340B program.  S.B. 28 impermissibly injects the Attorney General of Kansas, armed with state law penalties and other remedies, into what Congress intended to be an exclusively federal scheme.  S.B. 28 also conflicts with the objectives of the 340B statute, imposing requirements on drug manufacturers that conflict with the actual requirements of the 340B statute, thereby raising the costs of Medicaid participation above those set by Congress and deterring manufacturers from that participation.

16.     **Third**, in the alternative, if S.B. 28 does not effect an impermissible taking and is not preempted, then S.B. 28 is unconstitutionally vague.  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (collecting authority).  In determining whether a statute is constitutionally vague, a court evaluates (1) whether the statute gives fair warning to those who are potentially subject to it and (2) does the statute do an adequate job of guarding against arbitrary and discriminatory enforcement.  *City of Wichita v. Wallace*, 246 Kan. 253, 58-59 (1990).  The provisions of S.B. 28 that prohibit manufacturers from "interfering" with contract pharmacies provide no fair warning as to what conduct (or perhaps even speech) is actually prohibited, and manufacturers are instead left to guess at its meaning.

17.    ***Fourth***, S.B. 28, an omnibus budget appropriations bill for fiscal years 2024 through 2028, violates the Kansas Constitution's "one-subject rule."  Kan. Const., art. 2 § 16.  That provision, dating back to the time of Kansas statehood, prevents bills from containing more than one-subject.  Where an appropriations bill amends other substantive law or contains an action that is not an item of appropriation of money, it violates the one-subject rule.  *State ex Rel. Stephan v. Carlin*, 230 Kan. 252, 256, 258 (Kan. 1981).  Here, the obligations S.B. 28 places upon AbbVie, including forcing the transfer of AbbVie's private property to other private parties, are substantive regulation inappropriate for inclusion in the state's omnibus appropriations bill.  Because the bill suffers from this fatal legislative defect, it must be invalidated as violative of the Kansas Constitution.

18.    AbbVie seeks a declaration that S.B. 28 is unconstitutional because it constitutes an unconstitutional taking.  In the alternative, AbbVie seeks a declaration that S.B. 28 is unconstitutional because it is preempted by federal law or is unconstitutionally vague.  And, AbbVie seeks a declaration that S.B. 28 violates the Kansas Constitution's one-subject rule and therefore has no legal effect.  AbbVie further seeks injunctive relief barring the Kansas Attorney General from enforcing S.B. 28 against AbbVie.

## PARTIES TO THE ACTION

19.    AbbVie, Inc., a Delaware Corporation, is a global research-based biopharmaceutical company dedicated to addressing some of the world's most complex and serious diseases, and advancing medical science in areas such as immunology, oncology, and neuroscience.  Since 2012, AbbVie, Inc. has participated in the federal 340B drug discount program, helping uninsured and vulnerable patients obtain access to the medications they need.  AbbVie's headquarters are located in North Chicago, Illinois. AbbVie, Inc. is a signatory to 340B

Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

20.     Allergan, Inc., a Delaware Corporation, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

21.     Durata Therapeutics, Inc., a Delaware Corporation, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

22.     AbbVie Products LLC, a Georgia Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

23.     Aptalis Pharma US, Inc., a Delaware Corporation, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

24.     Pharmacyclics LLC, a Delaware Limited Liability Company, is a new party to this lawsuit, and a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

25.     Previously, Warner Chilcott Corporation merged with Allergan Sales, LLC and Allergan Sales, LLC is the surviving entity. Allergan Sales, LLC, a Delaware Limited Liability Company, is a signatory to 340B Pharmaceutical Pricing Agreements, and/or is successor-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

26.     Defendant Kris Kobach is the Attorney General of the State of Kansas.  In that role, he has the responsibility and authority to enforce the laws of the State of Kansas, including S.B.

28, which makes any violation a violation of the state's Consumer Protection Act.  *See* K.S.A. § 50-623 *et seq.*   S.B. 28 specifically mandates that the Attorney General "shall" make "expenditures . . . for fiscal year 2025 to enforce the provisions of the Kansas consumer protection act [sic] against a manufacturer" who otherwise violates section 32, subsection (g)(1)(A), (B), and section 33.   The Attorney General has enforcement authority over violations of the Kansas Consumer Protection Act.  K.S.A. § 50-628.  This suit is brought against him solely in his official capacity.

**JURISDICTION AND VENUE**

27.     AbbVie's causes of action arise under 28 U.S.C. § 1331, 42 U.S.C. § 1983, and the United States Constitution.

28.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1343(a)(3).

29.     The Court has authority to grant injunctive and declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the Court's inherent equitable powers, including the power to enjoin the actions of state officials if contrary to the United States Constitution or federal law.  *See Ex parte Young*, 209 U.S. 123, 159–60 (1908).

30.     Venue is proper in this District under 28 U.S.C. § 1391(b) because this action challenges a Kansas law that is applicable to AbbVie's sale and distribution of drugs at discounted prices under the federal 340B statute within this District.  AbbVie sells and distributes drugs to multiple 340B covered entities within this District, and these entities purport to maintain contract pharmacy arrangements.  Venue is also proper because the Defendant maintains offices, through which he would enforce the challenged law, in the cities of Topeka and Wichita within this District.

## GENERAL ALLEGATIONS

### A.    The 340B Drug Pricing Program

31.    This case concerns section 340B of the federal Public Health Service Act, which created the federal "340B program" as part of the authority granted in the Veterans Health Care Act of 1992.  *See* 42 U.S.C. § 256b; *see also* Pub. L. No. 102-585, § 602(a), 106 Stat. 4943, 4967 (1992).

32.    The purpose of the federal 340B program is to "reduce pharmaceutical costs for safety-net medical providers and the indigent populations they serve" by creating "a low-cost source of pharmaceutical medication for the indigent patients themselves."  Connor J. Baer, *Drugs for the Indigent: A Proposal to Revise the 340B Drug Pricing Program*, 57 Wm. & Mary L. Rev. 637, 638 (2015) (footnote omitted).

33.    Before Congress created the 340B program, individual manufacturers voluntarily provided their drugs at reduced prices to institutions that served needy and vulnerable patients.  In 1990, Congress passed a statute called the Medicaid Rebate Act, which had the unintended consequence of creating disincentives for manufacturers to continue providing those voluntary discounts.  H.R. Rep. No. 102-384, pt. 2, at 9–10 (1992).  Through the Veterans Health Care Act, Congress remedied that unintended disincentive and established the federal 340B program, turning the manufacturers' previous voluntary support into a federal mandate.

34.    The 340B statute requires that any manufacturer that participates in the federal Medicaid Drug Rebate Program must "offer" its covered outpatient drugs "for purchase" at deeply discounted prices to eligible "covered entities"—disproportionate share hospitals and other service providers that are expected to serve predominantly low-income and vulnerable patients.  42 U.S.C. § 256b(a)(1).

35.     The statute expressly limits participation in the 340B program to "covered entities." *See* 42 U.S.C. § 256b(a)(4).  The statute defines "covered entities" to include only organizations that predominantly serve low-income patients.  The definition includes, for example, federally qualified health centers, children's hospitals, qualifying rural hospitals, and clinics that serve vulnerable patients.  *Id*.  For-profit commercial pharmacies are not included in the statutory list of "covered entities."  *Id*. § 256b(a)(4).  Nor does the 340B statute include any provision authorizing covered entities to purchase manufacturers' drugs and dispense them through commercial pharmacies.  *See AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47, 60 (D. Del. 2021) ("It is hard to believe that Congress enumerated 15 types of covered entities with a high degree of precision and intended to include contract pharmacies as a 16th option by implication."), *aff'd sub nom. Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703 (3d Cir. 2023).

36.     The discounted 340B price for each of the manufacturer's drugs is calculated by subtracting the drug's Medicaid unit rebate amount from its Average Manufacturer Price, as determined under the federal Medicaid Drug Rebate Program, codified at section 1927 of the Social Security Act.  42 U.S.C. § 256b(a)(1)–(2) & (b).  The resulting prices, called the 340B "ceiling prices," are significantly lower than the prices at which manufacturers sell their products to other purchasers.  For the vast majority of innovator drugs, the mandatory discounts range from at least 23.1% to more than 99.9% of the average price in the market.  *See* 42 U.S.C. § 1396r-8(c); 42 U.S.C. § 256b(a)(1).  Many mandatory 340B ceiling prices are as little as one penny per unit of drug.

37.     To indicate their agreement to participate in the federal 340B program and comply with its requirements, manufacturers sign a form contract with HHS, called the Pharmaceutical Pricing Agreement.  That agreement is drafted by HHS.  It has "no negotiable terms," and it

"incorporate[s] the statutory obligations and record[s] the manufacturers' agreement to abide by them." *Astra*, 563 U.S. at 117–18.

38.     The Pharmaceutical Pricing Agreement imposes no obligation on participating manufacturers to sell discounted drugs to contract pharmacies.  Nor does the Pharmaceutical Pricing Agreement require manufacturers to cause their discounted drugs to be transferred to contract pharmacies.  Nor does it grant covered entities any right to obtain access to manufacturers' drugs at discounted prices through contract pharmacies.

39.     Both the Pharmaceutical Pricing Agreement and the federal 340B statute are structured to prevent commercial parties from participating in the federal 340B program or profiting from the sale of manufacturers' drugs at discounted prices.  Over the past decade, however, that is exactly what has happened as a result of covered entities entering into contractual relationships with commercial pharmacies.   Under these arrangements, instead of using manufacturers' deeply discounted drugs to treat the indigent and uninsured patients that visit a covered entity and receive healthcare services from the covered entity itself, commercial contract pharmacies sell manufacturers drugs at regular prices to pharmacy customers and then demand that their stocks be replenished with drugs purchased by the covered entity through the federal 340B program at discounted prices, pocketing the difference (the "spread") for their own financial benefit.

40.     In recent years, commercial contract pharmacies have earned annually over $3.3 *billion* in "spread."  *See* Eric Percher, et al., Nephron Research LLC, *The 340B Program Reaches a Tipping Point: Sizing Profit Flows and Potential Disruption* (2020) (concluding that $3.348 billion in 340B discounts were retained as profit by contract pharmacies in 2020 alone).

41.     These abuses of the federal 340B program raise obvious concerns because the U.S. Constitution prohibits the government from forcing the transfer of property at confiscatory prices to private parties for their own private benefit.  *See* U.S. Const. amend. V.  They also violate the letter and spirit of the federal 340B statute.  Congress designed the 340B statute with the intent that there would be a close nexus between the federal drug pricing program and its only valid public purpose—helping low-income and uninsured patients obtain access to medications at discounted prices.  Consistent with that intent, the statute prevents covered entities from using manufacturers' drugs to generate commercial profits or letting the drugs be transferred or sold to benefit entities outside the program.

42.     The statute expressly forbids "diversion" by prohibiting covered entities from selling or otherwise transferring any manufacturer's discounted drugs "to a person who is not a patient of the entity."  42 U.S.C. § 256b(a)(5)(B) ("With respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity").

43.     The statute also prohibits covered entities from receiving or causing "duplicate discounts or rebates."  They may not obtain a 340B discount and cause a Medicaid rebate to be paid by the manufacturer for the same unit of drug.  *Id*. § 256b(a)(5)(A).

44.     The statute imposes an affirmative duty on the Secretary of HHS—through authority delegated to HRSA—to protect the program's integrity by "provid[ing] for improvements in compliance by covered entities . . . in order to prevent diversion" and violations of the statute's duplicate discount prohibition.  *Id.* § 256b(d)(2)(A).

45.     The statute provides mechanisms for resolving administrative disputes between manufacturers and covered entities through audits and a federal Administrative Dispute Resolution

("ADR") process. *See id.* § 256b(d)(1)(B)(v), (d)(3). Notably, HHS's Health Resources and Services Administration ("HRSA") recently issued a final rule setting forth additional details of the congressionally prescribed 340B ADR process. *See* 89 Fed. Reg. 28643. The final rule established a comprehensive scheme to resolve disputes between manufacturers and covered entities arising under the 340B statute. Under the rule, a "340B ADR Panel" within HRSA is tasked with resolving not only disputes about drug prices but also "claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price"—the exact issue S.B. 28 seeks to address. *See* 42 C.F.R. §§ 10.3, 10.21; *accord id.* § 10.22(c)(1) ("A manufacturer is responsible for obtaining relevant information or documents from any wholesaler or other third party that facilitate the sale or distribution of its drugs to covered entities."); 89 Fed. Reg. 28649 (April 19, 2024) ("HHS agrees and has further modified § 10.21(a)(1) to further explain that an overcharge claim generally includes claims that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price."); *id.* at 28644 ("[T]he 340B Program is related to drug pricing and drug distribution.").

46. The statute entrusts enforcement of the 340B statute *exclusively* to the Secretary of HHS and details what penalties may apply. *See* 42 U.S.C. § 256b(a)(5)(C)–(D), (d)(1)(B)(v), (d)(3). As the Supreme Court reasoned in *Astra*, Congress made HHS administrator of both the Medicaid Drug Rebate Program and the 340B program, and private enforcement by covered entities "would undermine the [HHS's] efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Astra*, 563 U.S. at 119–20.

47. The 340B statute provides no private right of action to covered entities. *Id.* at 113–14.

48.     Failure to comply with the statutory requirements under the 340B program may result in termination of the Pharmaceutical Pricing Agreement (and the manufacturer's ability to participate in Medicaid), federal enforcement actions, and potentially the imposition of large civil penalties.  *See* 42 U.S.C. § 256b(a)(5)(D), (d)(1)(B)(vi), (d)(2)(B)(v), (d)(3)(A).

**B.     The Growth in Contract Pharmacy Arrangements**

49.     In 1996, HRSA issued non-binding guidance stating that the agency would not prevent covered entities *that lacked an in-house pharmacy* from entering into a contractual relationship with a *single* outside pharmacy to dispense covered outpatient drugs to the covered entity's patients.  61 Fed. Reg. 43,549 (Aug. 23, 1996).  The guidance made clear that it "create[d] no new law and create[d] no new rights or duties."  *Id.* at 43,550.

50.     Guidance documents, such as the 1996 guidelines, are by definition general statements of policy that are non-binding, non-enforceable, and do not create any legal rights or obligations.  They are intended instead to inform the public as to how HRSA intends to exercise its enforcement discretion.

51.     In 2010, HRSA issued new non-binding guidance that radically changed how covered entities operated under the 340B program.  The guidance stated, for the first time, that the agency would allow covered entities to enter into contractual relationships with an *unlimited* number of "contract pharmacies," even if the covered entity had an in-house pharmacy of its own. 74 Fed. Reg. 10,272 (Mar. 5, 2010).

52.     Like the 1996 guidance, the 2010 guidance did not impose binding obligations on manufacturers.  Indeed, HRSA again made clear that the non-binding guidance created no new rights and imposed no new obligations.  *See id.* at 10,273 ("This guidance neither imposes additional burdens upon manufacturers, nor creates any new rights for covered entities under the law").  In other words, while HRSA indicated that it would not interpret the 340B statute to prohibit

covered entities from using multiple contract pharmacies, it did not purport to impose any obligation on manufacturers to transfer drugs to contract pharmacies or otherwise facilitate covered entities' use of contract pharmacies.

53.     Following issuance of the 2010 guidance, covered entities dramatically increased their use of contract pharmacies, with a recent study reporting an increase of 4,228% between 2010 and 2020.  This explosion in the use of contract pharmacies has been driven by the prospect of sharing in the outsized profit margins on manufacturer-subsidized 340B drugs.  For example, in 2009 340B drug sales totaled just $4.2 billion, but by 2023 had increased by more than 30-fold to $124 billion.[1]

54.     Similarly, the number of covered entities participating in the program jumped from around 15,000 in 2010 to more than 50,000 by 2020.[2]

55.     Nor does the program's explosive growth correlate with an increase in indigent patients, or improvements in care.  Indeed, since 2010, the percentage of uninsured patients in the United States has fallen by nearly 38%.[3]

56.     Contract pharmacies, which are predominantly large commercial pharmacy chains, do not operate like in-house pharmacies, do not themselves qualify as covered entities, and do not owe fiduciary duties to the covered entities.  The relationships between covered entities and the for-profit, commercial pharmacies are governed by arm's-length contracts.  Contract pharmacies are not "agents" of the covered entities; they are merely business partners.  Importantly, these

---

[1]     Karen Mulligan, USC Schaeffer Cntr., White Paper: The 340B Drug Pricing Program: Background, Ongoing Challenges and Recent Developments, at 5 (Oct. 2021); Rory Martin & Harish Karne, IQVIA, White Paper: The 340B Drug Discount Program Grew to $124B in 2023, at 2 (2024).

[2]     Mulligan, White Paper *supra* note 2 at 4.

[3]     *See* Kenneth Finegold et al., HHS APSE Off. Of Health Pol'y, No. HP-2021-02, Issue Brief: Trends in the U.S. Uninsured Population, 2010-2020, at 2 (Feb. 11, 2021).

arrangements do not exist outside the context of the federal 340B program, as there is no other context in which commercial pharmacies are able to share in the "spread" generated by selling manufacturers' discounted drugs to their customers at full prices.

57.     Contract pharmacy arrangements generally use one of two inventory models: (1) pre-purchased inventory or (2) replenishment.

58.     A few contract pharmacies use the pre-purchased inventory model, in which a covered entity's 340B purchased drugs are kept in stock at the contract pharmacy, and when filling prescriptions on behalf of that covered entity, the contract pharmacy uses the covered entity's 340B purchased inventory.

59.     Most contract pharmacies, however, use what is known as the "replenishment" model. Under the replenishment model, no 340B purchased drugs are kept in stock at the contract pharmacy.  Instead, the contract pharmacy fills all prescriptions using its own non-340B purchased inventory (that is, full price inventory)—including those prescriptions issued by covered entities. After a sufficient quantity of a particular drug is dispensed, the covered entity orders additional quantities of that drug at the federal 340B price be transferred to the contract pharmacy to "replenish" the non-340B drugs dispensed by the contract pharmacy on the covered entity's behalf. *See* Declaration of RADM Krista M. Pedley, Director, Office of Pharmacy Affairs, HRSA, *Eli Lilly & Co. v. Becerra*, No. 1:21-cv-00081-SEB-MJD (S.D. Ind.), ECF No. 125-2 ¶¶ 3–11.

60.     Instead, they carry out 340B determinations at the back end, well after a drug has been dispensed (and likely consumed) by the patient.  Pharmacies first purchase AbbVie products for their general inventories at regular prices.  After a particular quantity of a particular drug is dispensed to pharmacy customers, the pharmacy, either itself or through a third-party administrator ("TPA") with which it contracts, retroactively determines which prior dispensing events should be

linked with 340B eligibility.  Based on that determination, they then instruct covered entities—or sometimes even without going through a covered entity—to place orders for drugs at the discounted 340B price to "replenish" their general inventories to make up for the higher, regular prices they paid at the beginning.

61.     In other words, under the replenishment model, contract pharmacies do not keep a separate inventory of 340B drugs but instead dispense drugs to both 340B and non-340B patients alike out of their general inventories.  Nor do most contract pharmacies attempt to determine prior to or at the point of sale whether the patient is eligible for a 340B discounted drug.  In almost all instances, contract pharmacies order AbbVie-manufactured drugs and dispense them to their customers at full price without knowledge as to whether, at the time of dispensing, that patient is a 340B-eligible patient.

62.     For-profit pharmacies purchase AbbVie products for their general inventories at market prices.  After a particular quantity of a particular drug is dispensed to pharmacy customers, the pharmacy, either itself or through a third-party administrator ("TPA") with which it contracts, determines which prior dispensing events should be linked with 340B eligibility.  This determination is based on the contract pharmacy's own criteria, without any involvement from the covered entities.  If those criteria are designed correctly, the post-sale determination may be able to calculate how many 340B drugs AbbVie must sell.  But in reality, the contract pharmacies' criteria often include prior patients, who no longer receive the 340B discounted drugs at the pharmacy but are included under a "once-a-patient-always-a-patient" approach, so the covered entity and its pharmacies are able to maximize the arbitrage profits from the 340B program.  As the D.C. Circuit observed, "[t]he covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement

rate.  Each of these actors thus has a financial incentive to catalog as many prescriptions as possible as eligible for the discount."  *Novartis*, 102 F.4th at 457–58.

63.     At the same time as they use their own distorted criteria to mark otherwise 340B-ineligible sales as deserving the federally mandated low prices, contract pharmacies (typically through a TPA) instruct covered entities—sometimes even without going through a covered entity—to place orders of additional quantities of drugs at the discounted 340B price to "replenish" their general inventories that they will use to supply non-340B eligible sales.  Significantly, as a result of such replenishment, contract pharmacies take title to the drugs they purchase from manufacturers, either through covered entities or on their own behalf.  At no point in time does a covered entity take title to the drugs under this model.  *See Sanofi Sues HHS, HRSA for Contract Details Between Covered Entities, Contract Pharmacies*, 340B Report (June 18, 2024) (according to a covered entity spokesperson, "in order for the replenishment model to work, 'the title to 340B drugs transfers to the contract pharmacy at the time it is taken into inventory.'").  AbbVie is also not aware of any instance where a contract pharmacy or covered entity represents that an agency relationship exists between them such that the (agent) contract pharmacy acts at the direction of a (principal) covered entity.

64.     In practice, therefore covered entities and contract pharmacies share in the "spread" generated by selling the drugs at higher prices to pharmacy customers and/or seeking full commercial reimbursement from the patients' insurance plans.  For-profit, commercial pharmacies thereby obtain significant profits from selling the 340B covered outpatient drugs that manufacturers must offer to covered entities at deeply discounted prices.

65.     By dramatically expanding the pool of individuals who can access the drugs that covered entities can buy at discounted prices—including individuals who do not qualify as patients

of the covered entity—covered entities and commercial pharmacies can obtain profits that extend far beyond Congress's intent when it created the 340B program.  One study found that in 2018 alone, covered entities and their contract pharmacies generated more than $13 billion in estimated gross profits from the purchase of manufacturers' drugs at mandated 340B prices.

66.    When commercial pharmacies are brought into the program, there is a significantly greater risk that manufacturers' discounted drugs will be dispensed to individuals who are not "patients" of the covered entity.  As HHS has found, contract pharmacy arrangements "create complications in preventing diversion" (for example, contract pharmacies cannot verify patient eligibility in real-time like a covered entity can).  HHS Office of Inspector General, OEI-05-13-00431, Mem. Report: Contract Pharmacy Arrangements in the 340B Program (2014) ("HHS Report"), at 1.

67.    Because contract pharmacies often dispense 340B covered outpatient drugs from the same inventory as drugs dispensed to all other customers (and seek replenishment after the fact), the opportunities for unlawful distributions to ineligible patients increases, allowing covered entities and contract pharmacies to profit from the diversion that Congress intended to prohibit. *See* GAO, *Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement*, GAO-11-836, at 28 (Sept. 2011) (noting that "approximately two-thirds of diversion findings in HRSA audits involved drugs distributed at contract pharmacies"); GAO, *Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement*, GAO-18-480, at 35, 43–44 (June 2018) (finding 45% of covered entities that responded to a recent GAO survey admitted they do not provide any discount to patients who use their contract pharmacies; and many of the remaining 55% reported rarely giving discounts to patients obtaining medicines through contract pharmacies).

68.     Covered entities and commercial pharmacies reap windfalls from gaining access to manufacturers' drugs at deeply discounted prices under the federal 340B program, but uninsured and underinsured patients are not benefitting.  *See* HHS Report, at 2 (finding that "some covered entities in our study do not offer the discounted 340B price to uninsured patients at their contract pharmacies"); Adam J. Fein, *The Federal Program that Keeps Insulin Prices High*, Wall. St. J. (Sept. 10, 2020) (explaining that "almost half the U.S. pharmacy industry now profits from the 340B program, which is designed as a narrow support to certain hospitals," while patients "don't benefit," even though manufacturers have "practically given the product away"); IQVIA Study, at 12 ("The 340B Drug Discount Program as it exists today is a complex system of arbitrage . . . in which most vulnerable patients at contract pharmacies do not get drug discounts."); Lin JK, et al., *Assessment of US Pharmacies Contracted with Health Care Institutions Under the 340B Drug Pricing Program by Neighborhood Socioeconomic Characteristics*, JAMA Health Forum (2022), at 2 (finding that contract pharmacy growth from 2011–2019 was concentrated in affluent and predominantly White neighborhoods and that the share of 340B pharmacies in socioeconomically disadvantaged and primarily non-Hispanic Black and Hispanic/Latino neighborhoods declined).

69.     For example, the North Carolina Department of the State Treasurer published a recent report explaining that "some hospitals are using the 340B program to enrich themselves rather than to serve vulnerable communities," and "instead . . . expanded into wealthier neighborhoods with a higher percentage of insured individuals who pay more for the drugs."  N.C. Dep't of State Treasurer, N.C. State Health Plan, Overcharged: State Employees, Cancer Drugs, and the 340B Drug Pricing Program, at 3.

70.     While commercial pharmacies are driving massive growth in the 340B program—at double-digit annual rates—charity care by hospitals has decreased.  Commentators have noted,

for example, that as the 340B program has grown at a remarkable rate, the total value of hospitals' uncompensated care has significantly declined.  *See* Letter from Adam J. Fein to Hon. Lamar Alexander and Hon. Greg Walden in response to request for input on 340B drug pricing program (Oct. 30, 2020); Adam J. Fein, *340B Program Purchases Reach $24.2 Billion—7%+ of the Pharma Market—As Hospitals' Charity Care Flatlines*, Drug Channels (May 14, 2019).

71.     Both the New York Times and Wall Street Journal have run exposés describing the flaws in contract pharmacy arrangements, flaws that enable large scale fraud and damage the very communities that the federal 340B program was designed to help.  *See* Katie Thomas & Jessica Silver-Greenberg, *Profits Over Patients: How a Hospital Chain Used a Poor Neighborhood to Turn Huge Profits*, NY Times (Sept. 24, 2022) (describing how one 340B hospital "has been slashing services at Richmond Community while investing in the city's wealthier, white neighborhoods, according to more than 20 former executives, doctors and nurses"); Anne Wilde Mathews et al., *Many Hospitals Get Big Drug Discounts. That Doesn't Mean Markdowns for Patients.*, Wall Street Journal (Dec. 22, 2022) ("The data show that hospitals often extend their 340B discounts to clinics in well-off communities, where they can charge privately insured patients more than those on Medicaid" which "raise questions about the program's growth and purpose").

### C.     Manufacturers' Response to HRSA's Overreach

72.     AbbVie and other manufacturers have exercised their lawful right to decline covered entity requests that manufacturers provide their discounted 340B drugs to an unlimited number of commercial pharmacies.

73.     AbbVie has implemented initiatives making clear that it will not indiscriminately accept requests that it transfer 340B discounted drugs to an unlimited number of third-party commercial contract pharmacies servicing hospital covered entities.

74.     As 340B abuse continued to grow, with covered entities seeking the provision of 340B drugs to an excessive number of for-profit pharmacies—sometimes located more than 100 miles from the covered entity's location—AbbVie updated its policy to place reasonable limits around provision to contract pharmacies. Specifically, if a covered entity has its own in-house pharmacy, AbbVie's policy now is to only take orders for direct delivery to the in-house pharmacy. However, if a covered entity does not have an in-house pharmacy capable of dispensing to outpatients, it is permitted to designate one contract pharmacy located within 40 miles of the HRSA registered covered entity parent site.  AbbVie will facilitate bill to/ship to orders of 340B priced medicines to that location, but to prevent 340B abuse, the covered entity must submit limited claims data on 340B utilization for such contract pharmacy location.  In implementing its initiatives, AbbVie has confirmed that it will continue to offer "each covered entity" the ability to "purchase" its covered outpatient drugs "at or below the applicable ceiling" price set by statute. 42 U.S.C. § 256b(a)(1).  AbbVie's policy is not only consistent with those upheld by the Third and D.C. Circuits but also gives covered entities and contract pharmacies more convenience at its own expense. *See Sanofi Aventis*, 58 F.4th at 701; *Novartis*, 102 F.4th at 463–64.

75.     AbbVie is committed to ensuring that each hospital covered entity has at least one pharmacy location where it can receive shipments of discounted AbbVie medicines, and out of which it can dispense AbbVie's discounted 340B drugs to qualifying patients.  If a hospital covered entity is unable to identify an eligible contract pharmacy within 40 miles, AbbVie will work with the covered entity to identify a suitable alternative.

76.     In addition to AbbVie, many other pharmaceutical manufacturers have adopted policies directed at addressing abuses of the 340B program by covered entities and contract pharmacies.  Like AbbVie's, these policies do not refuse to supply drugs at discounted prices under

the federal 340B program solely because the covered entity has an arrangement with a number of contract pharmacies; instead, they are directed at addressing program abuses.

### D. Litigation in Federal Courts

77.    HHS initially recognized that it lacked authority to compel manufacturers to transfer drugs to contract pharmacies. *See* Tom Mirga, HRSA Says Its 340B Contract Pharmacy Guidance Is Not Legally Enforceable, 340B Report (July 9, 2020).  HHS then reversed its position and attempted to impose a new obligation on manufacturers.

78.    On December 30, 2020, HHS issued a final decision—labeled an "Advisory Opinion"—that for the first time ever purported to require manufacturers to facilitate the transfer of their products to for-profit commercial pharmacies.  *See* HHS, Advisory Opinion No. 20-06, Contract Pharmacies Under the 340B Program (Dec. 30, 2020).  Various manufacturers brought suit in early 2021 to challenge this HHS decision.

79.    On May 17, 2021, the government sent certain manufacturers "compliance" letters purporting to enforce the 340B statute, which stated that HHS had made a final determination that AbbVie had violated the 340B statute by not agreeing to transfer 340B discounted drugs to unlimited contract pharmacies.

80.    While the December 30 decision was later withdrawn following a ruling from the federal district court for the district of Delaware, *see AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47 (D. Del. 2021), the May 2021 letters were not withdrawn.

81.    Kansas, through its Attorney General, filed amicus briefs on behalf of Kansas in the Third and D.C. Circuit Courts of Appeals in support of HHS, expressing disapproval of the manufacturers' policies.  *See Sanofi-Aventis*, 21-3167 (3d Cir.), ECF No. 34 (Brief of Amicus Curiae); *Novartis*, No. 21-5299 (D.C. Cir.) (Corrected Brief of Amicus Curiae, filed 5/23/2022).

82.     On January 30, 2023, the Third Circuit issued a decision recognizing that Congress intentionally "chose not to" impose delivery-related obligations on manufacturers, explaining that the federal 340B statute's plain text suggests that Congress intended "one-to-one transactions between a covered entity and a drug maker without mixing in a plethora of pharmacies." *See Sanofi Aventis*, 58 F.4th at 704.

83.     The Third Circuit further found that manufacturers' policies do not prevent covered entities from participating in the 340B program or entering into contractual relationships with commercial pharmacies.  Under manufacturers' policies, covered entities "can still buy and dispense unlimited discounted drugs by having them delivered to an in-house or contract pharmacy." *Id.* at 703.

84.     The Third Circuit rejected the argument that manufacturers were not permitted to address program abuses, such as diversion and duplicate discounting, by imposing restrictions on when they will transfer drugs to commercial pharmacies.

85.     On May 21, 2024, the District of Columbia Circuit issued its own opinion endorsing the same view, holding that "section 340B merely requires manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount." *Novartis*, 102 F.4th at 460.  As a result, as long as a manufacturer's policy "neither precludes [it] from making a bona fide 'offer' nor increases its contract 'price'"—such as only "deliver[ing] section 340B drugs to a covered entity's in-house pharmacy or to a single contract pharmacy designated by the covered entity—the condition is legitimate and may be enforced without running afoul of 340B. *Id.* at 463–64.

**E.      The Kansas Law**

86.     After the Third Circuit's decision upholding the manufacturers' policies, the relevant language regarding the 340B program and contract pharmacy use was introduced in the

Kansas House of Representatives as part of an omnibus budget appropriations bill, S.B. 28.  On April 25, 2024—long after the debate about the role of contract pharmacies in the federal 340B program had reached and been decided by federal courts across the country—the Kansas Legislature enacted S.B. 28.

87.    Only a few days later, Kansas legislators approved a different omnibus appropriations bill, H.B. 2551, with language that would prevent the 340B provisions in S.B. 28 from taking effect until the Supreme Court of the United States weighed in on the contract pharmacy issue in light of other ongoing litigation around the country.  The passage of H.B. 2551 sent the 340B contract pharmacy question back to Governor Kelly, who line item-vetoed the "pause" on S.B. 28's 340B provisions, explaining that the "proviso is pre-mature and contradictory to the protections outlined in Senate Bill 28."[4]  S.B. 28 goes into effect on July 1, 2024.

88.    The text of S.B. 28 makes clear that compelling a private wealth transfer of 340B priced drugs from one party to another, and changing the terms of the federal 340B program, are its regulatory objects.  Subsection (g)(2) defines the terms "340B drug" and "340B-covered entity" by referencing 42 U.S.C. § 256b, the 340B statute.  *See* S.B. 28, §§ 32, (g)(2)(A), (B), 33.  In other words, the Kansas statute cannot exist except in the context of the federal 340B program.

89.    S.B. 28 contains two provisions that apply to pharmaceutical manufacturers: S.B. 28, §§ 32, (g)(1)(A) and (B), 33.

90.    Section 32, subsection (g)(1)(A)[5] states: that a manufacturer may not "[d]eny, restrict, prohibit or otherwise interfere with the acquisition of a 340B drug by or delivery of a 340B

---

[4]    *See* Governor Laura Kelly, *Message from the Governor Regarding House Bill 2551*, https://governor.kansas.gov/wp-content/uploads/2024/05/HB-2551-Line-Item-Veto-Statement-Signed.pdf

[5]    The language is identical with respect to § 33(a)(1)(A), applying to FY 2026.

drug to a pharmacy that is under contract with a 340B-covered entity and authorized under such contract to receive and dispense 340B drugs on behalf of the 340Bcovered entity [sic], unless such receipt and dispensing of 340B drugs by such pharmacy is prohibited by the United States department of health and human services [sic]."

91.     Section 32, subsection (g)(1)(B)[6] states: a manufacturer may not "interfere with a pharmacy that has a contract with a 340B-covered entity."

92.     The statute cites no source, under the 340B statute or elsewhere, that permits Kansas to add requirements to the conditions for participating in the federal 340B program, or that authorizes Kansas to establish an enforcement process for the Attorney General to seek remedies for alleged violations of the federal 340B requirements.

93.     "Interference" is not defined in the Chapter.

94.     The expenditure authorization provides that the Attorney General "shall" make expenditures pursuant to the statutory language "to enforce the provisions of the Kansas consumer protection act [sic] against a manufacturer that engages in" the actions described above at paragraphs 87–88. K.S.A. § 50-623 *et seq*.  A violation of the Kansas Consumer Protection Act permits the Attorney General to seek injunction and other relief, including damages, revocation of the right to do business in the state, and an order of sequestration for disputed property.  K.S.A § 50-631.

95.     Under Kansas's Consumer Protection Act, the Attorney General and any county or district attorneys under his supervision may seek "to obtain a declaratory judgment that an act or practice violates this act."  K.S.A. § 50-632(a)(1).  The Attorney General, county and district attorneys may also seek injunctive relief for violations and may seek "to recover damages on behalf

---

[6]     The language is identical with respect to § 33(a)(1)(B), applying to FY 2026.

of consumers by reason of violations of this act; and to recover reasonable expenses and investigation fees." K.S.A. § 50-632(a)(2)–(4).

96.     S.B. 28 purports to require AbbVie to provide its 340B discounted drugs—its property—to an unlimited number of for-profit commercial pharmacies, or be subject to the penalties available to the Attorney General pursuant to the Kansas Consumer Protection Act.

97.     Moreover, there is no way to read S.B. 28 in congruence with the 340B statute. There is no role for states to regulate 340B pricing and the distribution of 340B priced drugs to entities permitted as a matter of federal law to participate in the federal program and obtain access to manufacturers' drugs at discounted prices. The specific provisions of S.B. 28 conflict with Section 340B's requirements for drug manufacturers as well as its enforcement and penalty scheme.

## STANDING

98.     AbbVie is injured by S.B. 28 because the law forces AbbVie to provide its private property to another private party in a prohibited A-to-B wealth transfer. Moreover, the law subjects AbbVie to the Kansas Attorney General's enforcement of the Act's requirements. Plaintiffs are signatories to 340B Pharmaceutical Pricing Agreements, and/or are successors-in-interest to executed 340B Pharmaceutical Pricing Agreements, with HRSA.

99.     AbbVie's injuries are fairly traceable to S.B. 28 because the statute compels a private transfer of AbbVie's 340-discounted drugs to private, for-profit commercial pharmacies. There is no recognized public use or purpose for such a transfer. That transfer would not occur but-for the operation of S.B 28's prohibition on AbbVie's contract pharmacy policy. In addition, the statute seeks to impose new state law obligations on drug manufacturers participating in the 340B program beyond those required by the federal statute. Neither section 340B, nor any existing regulation, nor the Pharmaceutical Pricing Agreement, contains these requirements. Moreover,

the Act purports to grant the Kansas Attorney General authority to enforce the Act in a way that violates federal law and would infringe on AbbVie's property rights.

100.    A favorable ruling is likely to address AbbVie's injuries.  Enjoining the provisions of S.B. 28 that apply to pharmaceutical manufacturers and unconstitutionally force the taking of their private property for no public use would redress AbbVie's injuries because AbbVie's property would not be unconstitutionally taken, and AbbVie would not be exposed to state-imposed penalties for exercising its rights under the 340B program and the Constitution.  Similarly, a declaratory judgment would redress AbbVie's injuries because AbbVie would not be exposed to enforcement actions and accumulating penalties.

## BASIS FOR INJUNCTIVE RELIEF

101.    Harm is irreparable "when the injury can[not] be adequately atoned for in money, or when the district court cannot remedy [the injury] following a final determination on the merits." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (internal quotations omitted); *see also Free The Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 795 (10th Cir. 2019) (affirming district court's issuance of preliminary injunction). Moreover, "[i]mposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury." *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010), citing *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994); *see also Koontz v. Watson*, 283 F. Supp. 3d 1007, 1026 (D. Kan. 2018) (holding that the plaintiff showed irreparable harm when a Kansas law was "chilling plaintiff's and other putative state contractors' speech rights.").  Here, a taking occurs each and every time that a drug manufacturer is required against its own volition to transfer its drugs at the 340B discount price to a commercial pharmacy for the private benefit of that pharmacy.  Moreover, forcing AbbVie to be subjected to state administrative enforcement

proceedings that are preempted by and in conflict with federal law would impose irreparable harm on AbbVie. *See Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1545 (10th Cir. 1994) (affirming grant of preliminary injunction when a state agency changed the reimbursement rate scheme for Medicaid-certified nursing homes because plaintiffs showed "that defendants did not engage in a bona fide findings process prior to implementing the current reimbursement rate and prior to making assurances" that the rate complied with the Medicaid Act.).

102.    Effecting an unconstitutional taking of AbbVie's private property in a forced transfer to another private party for no recognized public use or purpose constitutes an irreparable injury. *See Laclede Gas Co. v. St. Charles Cnty.*, 713 F.3d 413, 419-20 (8th Cir. 2013) (affirming grant of preliminary injunction on takings claim).

103.    Further, if S.B. 28 is not enjoined as applied to AbbVie, AbbVie would be exposed to additional state law requirements as a condition of participating in the federal 340B program and would risk violating S.B. 28 simply by performing its federally mandated functions.  A party may be irreparably injured in the face of the threatened enforcement of a preempted law.  *Planned Parenthood Kansas v. Moser*, 747 F.3d 814, 823 (10th Cir. 2014); *see also Prairie*, 253 F.3d at 1250 (finding irreparable harm where the state's "threat of continued citation of Potawatomi tribe members under the state' motor vehicle registration law impermissibly interfered with tribal self-government); *Fish v. Kobach*, 840 F.3d 710, 754 (10th Cir. 2016) ("[W]e reject the notion that the source of an injury is a litigant's decision not to comply with an allegedly unlawful state regime, rather than the regime itself."); *Edmondson*, 594 F.3d at 771 (affirming the district court's finding of irreparable harm when Plaintiffs showed "a strong likelihood of succeeding on the merits of their preemption challenges.").

104.     If drug manufacturers such as AbbVie are required to provide their drugs to contract pharmacies, the magnitude of the economic loss is beyond the capacity of Kansas to compensate with damages.  Discounted purchases under the program reached approximately $44 billion for fiscal year 2021.  *See* HRSA, 2021 340B Covered Entity Purchases, https://www.hrsa.gov/opa/updates/2021-340b-covered-entity-purchases.  Conversely, the Governor's total recommended state budget for FY 2024 totaled $24.1 billion.[7]  The ordinary legal remedy of damages would be insufficient to cover AbbVie's losses.  *See Eastern Enters. v. Apfel*, 524 U.S. 498, 521 (1998) (plurality op.) (noting that the Supreme Court has considered injunctive relief where there is a "lack of a compensatory remedy").

105.     Prospective injunctive relief is appropriate because of the ongoing nature of the infringement of constitutional rights resulting from S.B. 28.  The law effects a repeated and ongoing mandatory private wealth transfer of AbbVie's 340B-discounted drugs to private, for-profit commercial pharmacies for the private benefit of that pharmacy and for no recognized public use, in violation of the United States' Constitution.  The law deprives AbbVie and other manufacturers of their federal rights under the actual terms of the 340B program.  And, S.B. 28 threatens to impose significant penalties upon manufacturers if they do not capitulate to Kansas's attempt to modify the terms of that federal program.  The deprivation of constitutional rights constitutes irreparable injury for purposes of a preliminary injunction.  *See Pinson v. Pacheco*, 397 F. App'x 488, 491 (10th Cir. 2010) (citing Wright & Miller, Federal Practice and Procedure § 2948.1 n. 26 (2d ed. 1995); *Adams by and Through Adams v. Baker*, 919 F. Supp. 1496, 1505 (D. Kan. 1996) (finding that where Plaintiff has alleged depravation of her constitutional rights, "no

---

[7]     *See* https://www.kslegresearch.org/KLRD-web/Publications/BudgetBookFY24/ba_volume_1.pdf.

further showing of irreparable harm is required . . . A deprivation of a constitutional right is, itself, irreparable harm.").

106.    Granting injunctive relief here would not harm the State.  It is well settled that the State has no interest in enforcing a regulation that violates federal law.  *See Edmondson*, 594 F.3d at 771 (affirming preliminary injunction because the state "does not have an interest in enforcing a law that is likely constitutionally infirm. Moreover, 'the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law.'"); *Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001) (finding that enjoining the enforcement of statutes likely to be held unconstitutional "is an appropriate remedy not adverse to the public interest.").  Moreover, there is no evidence that uninsured and needy patients—in Kansas or anywhere else—benefit from the use of contract pharmacies, and Kansas has no legitimate interest in enriching commercial pharmacies at the expense of manufacturers and patients.

107.    Granting injunctive relief would be in the public interest.  The public has no legitimate interest in enforcing unconstitutional laws, particularly those that force a private property transfer for no public use or purpose. By contrast, the public has a strong interest in preventing states from imposing unconstitutional requirements that force the transfer of private property for the private benefit of private commercial parties.  Further, the public has a strong interest in enforcing federal law and not permitting states to change the requirements for participation in federal healthcare programs.

## FIRST CLAIM FOR RELIEF

### *Prospective Injunctive Relief and Declaratory Relief –* *Violation of Takings Clause, U.S. Const. amend. V, cl. 4*

108.    AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

109.    The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation."  U.S. Const. amend V.; *see also Chicago, Burlington & Quincy Ry. v. Chicago*, 166 U.S. 226, 234–35 (1897) (incorporating and making applicable to states the Takings Clause of the Fifth Amendment through the Due Process Clause of the Fourteenth Amendment).

110.    The Takings Clause extends to both real and personal property.  *Horne*, 576 U.S. at 358.  It is not limited to instances when the government physically appropriates property for its own use through eminent domain.  A taking can also occur through legislation and regulation that sufficiently deprives a user of its property rights.  *See E. Enters. v. Apfel*, 524 U.S. 498, 529 (1998).

111.    Under the Constitution, the government has no authority to force A-to-B transfers of private property for the benefit of private parties.  *See Kelo*, 545 U.S. at 477 (explaining that "the sovereign may not take the property of *A* for the sole purpose of transferring it to another private party *B*, even though *A* is paid just compensation").  Such private takings are always unconstitutional, since "[n]o amount of compensation can authorize such action."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005); *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 388 (1798) ("[i]t is against all reason and justice" to allow government to "take[] property from A. and give[] it to B").

112.    "Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred."  *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021).  Statutes or regulations that mandate the physical transfer of personal property from one private party to another private party amount to an unconstitutional taking with or without just compensation.

113.    S.B. 28 appropriates AbbVie's property rights in its drugs for the private benefit of for-profit, commercial pharmacies.  If Kansas requires manufacturers to provide their drugs to

other private entities at below-market prices—by purporting to add that as a state-law obligation attached to the federal 340B scheme—then Kansas is engaged in an impermissible per se violation of the Constitution's Takings and Due Process Clauses.

114.    In the alternative, S.B. 28 effectuates a partial regulatory taking.

115.    In *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 (1978), the Supreme Court recognized that a regulatory taking requires consideration of a flexible three-factor test: (1) the economic impact of the regulation, (2) the extent to which the regulation has interfered with investment backed expectations, and (3) the "character of the governmental action."

116.    S.B. 28's purported requirement that manufacturers transfer their drugs to commercial pharmacies is constitutionally impermissible because it requires the physical acquisition of AbbVie's drugs by another private party for no public purpose or use; imposes significant financial losses on AbbVie and other manufacturers; interferes with drug manufacturers' reasonable investment backed expectations; and serves no valid government purpose because it deprives manufacturers of the full use and control of their property on a continual basis for the commercial benefit of private parties.

## SECOND CLAIM FOR RELIEF

### *(In the Alternative)*
### *Declaratory/Injunctive Relief – Federal Preemption Under*
### *the Supremacy Clause, U.S. Const. art. VI, cl. 2*

117.    AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

118.    Under the Supremacy Clause of the Constitution, federal law is "supreme . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art.

VI, cl. 2.  As a result, federal statutes enacted by Congress can preempt state law.  *See, e.g.*, *Kidneigh v. Unum Life Ins. Co. of Am.*, 345 F.3d 1182, 1185 (10th Cir. 2003).

119.   Preemption can take multiple forms: "Federal statutes can preempt state statutes either by an express statement of preemption or by implication."  *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1241 (10th Cir. 2011).

120.   One type of implied preemption is field preemption, where federal law is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, or where an Act of Congress touches a field in which the interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1325 (10th Cir. 2010).  Field preemption occurs where Congress intends "to foreclose any state regulation in the area, even if it is parallel to federal standards."  *Arizona v. United States*, 567 U.S. 387, 401 (2012).

121.   The 340B program is a comprehensive federal healthcare program.  Every detail of the 340B program is determined by federal law, including which entities are eligible to participate in the program and the consequences for participating manufacturers who fail to comply with the 340B statute's requirements.  The statute does not authorize state regulation concerning 340B pricing and who is entitled to access manufacturers' drugs at discounted 340B prices.  It leaves no room for states to interfere with the carefully designed 340B program.

122.   It is foundational constitutional law that States may not use their police power to regulate Congress's creations.  *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 159 (1819) (Marshall, C.J.).  A state law may not change the conditions for participation in the federal Medicare and Medicaid programs.  Any attempt by Kansas to regulate in this area impermissibly

changes the requirements for participating in the federal 340B program and nullifies the "natural effect" of federal law. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000).

123.     Another type of implied preemption is conflict preemption. Conflict preemption occurs where it is impossible for a private party to comply with both state and federal law and also where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 372–73 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (alterations omitted).

124.     S.B. 28 purports to grant the Kansas Attorney General a substantive role in the 340B program's administration and enforcement, despite and in conflict with the comprehensive compliance and enforcement regime Congress provided. The Kansas Attorney General is not the entity Congress tasked with enforcement of the 340B statute. "Congress made HHS administrator of both the Medicaid Rebate Program and 340B Program." *Astra*, 563 U.S. at 120. State enforcement "would undermine the agency's efforts to administer both Medicaid and § 340B harmoniously and [uniformly]." *Id.*

125.     Congress not only defined who was entitled to administer the 340B program (the Secretary of HHS, who has lawfully delegated the authority to HRSA), it also delineated which tools were available to the Secretary to ensure compliance. The 340B statute defines which audit procedures and ADR mechanisms are available under the 340B program for handling disputes among manufacturers and covered entities concerning program compliance. *See* 42 U.S.C. § 256b(d)(1)(B)(v), (d)(3). Likewise, Congress outlined the penalties that apply to manufacturers who violate the statutory requirements under the 340B program and engage in "overcharging." *See* 42 U.S.C. § 256b(d)(1)(B)(vi), (d)(2)(B)(v). S.B. 28's attempts to install an alternative compliance and enforcement regime, with different regulators and distinct penalties, conflicts with

the procedures detailed in the 340B statute and the lawfully promulgated federal rules implementing the statute.

126.    Kansas also has no lawful authority to force manufacturers to transfer their drugs under the 340B program at deeply discounted prices to any entity, let alone commercial pharmacies that do not qualify as covered entities under the program.  The carefully delineated obligation for manufacturers to offer 340B priced drugs to covered entities is lawfully imposed by federal law solely as a condition of a manufacturer's participation in federal healthcare programs.  To the extent that Kansas seeks to impose, through S.B. 28, any substantive obligation on manufacturers beyond what federal law requires, that state law obligation is preempted by federal law.

### THIRD CLAIM FOR RELIEF

#### *Declaratory/Injunctive Relief – Due Process Clause, U.S. Const. art. XIV*

127.    AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

128.    The Due Process Clause of the Fourteenth Amendment provides that no State may "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

129.    A statute is unconstitutionally vague if "persons of common intelligence must necessarily guess at its meaning and differ as to its application."  *State v. Harris*, 467 P.3d 504, 507 (Kan. 2020) (citation omitted).  In the civil context, the statute "must be shown to be vague in the sense that no standard of conduct is specified at all."  *City of Topeka v. Mayer*, 826 P.2d 527, 529 (Kan. Ct. App. 1992).  However, "if a statute could subject a person to both criminal and administrative actions, . . . the criminal standard for determining vagueness applies."  *Boatright v. Kansas Racing Comm'n*, 834 P.2d 368, 372 (Kan. 1992) (applying the criminal standard when a Kansas statute resulted in license revocations and a fine).

130.    The language in a quasi-criminal statute must "convey[] a sufficiently definite warning of the conduct proscribed when measured by common understanding and practice, [and it must] adequately guard[] against arbitrary and discriminatory enforcement." *Smith v. Martens*, 106 P.3d 28, 33 (Kan. 2005).

131.    S.B. 28's provisions that prohibit a manufacturer's "interfere[nce]" with a contract pharmacy are unconstitutionally vague and do not provide drug manufacturers with fair notice as to what conduct is actually prohibited.

132.    "Interference" is not defined in S.B. 28.  The meaning of the word is especially ambiguous given that the Third and D.C. Circuits, along with multiple federal district courts, have confirmed that drug manufacturers' policies imposing reasonable conditions on the provision of 340B drugs to contract pharmacies are lawful under Section 340B (yet such policies are prohibited under S.B. 28).  *See Sanofi*, 58 F.4th 696; *Novartis*, 102 F.4th 452.

133.    And "pharmacy" is defined, by cross-reference to K.S.A. § 65-1626, to include *any* "premises, laboratory, area or other place, including any electronic medium: (1) Where drugs are offered for sale where the profession of pharmacy is practiced and where prescriptions are compounded and dispensed; (2) that has displayed upon it or within it the words 'pharmacist,' 'pharmaceutical chemist,' 'pharmacy,' 'apothecary,' 'drugstore,' 'druggist,' 'drugs,' 'drug sundries,' or any of these words or combinations of these words or words of similar import in any language or on any sign containing any of these words as used in the context of health, medical or pharmaceutical care or services; or (3) where the characteristic symbols of pharmacy or the characteristic prescription sign 'Rx' may be exhibited in the context of health, medical or pharmaceutical care or services."   K.S.A. § 65-1626(zz). Premises refers "only to the portion of any building or structure leased, used or controlled by the licensee in the conduct of the business

registered by the board at the address for which the registration was issued." *Id.* at § 65-1626(zz)(3). Because the application of S.B. 28 may theoretically apply to all pharmacies nationwide if a Kansas resident is provided drugs or pharmacy care at that pharmacy, manufacturers have no way of predicting or understanding the scope of S.B. 28's prohibition on "interference" in that vast and unbounded context.

134.    To the extent S.B. 28 is not preempted and does not unconstitutionally appropriate AbbVie's property for private use, then it is unconstitutionally vague on its face.  The provisions prohibiting manufacturers from "interfering" with contract pharmacies fails to provide fair notice as to what is prohibited.  Persons of common intelligence must guess at its meaning and may well offer vastly different yet reasonable interpretations of its scope.  This is especially concerning given the quasi-criminal penalties of the act and its potential to reach speech as well as conduct.

## FOURTH CLAIM FOR RELIEF

### *Declaratory/Injunctive Relief – Due Process Clause, Kan. Const. § 18*

135.    AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

136.    Like its federal counterpart, Section 18 of the Kansas Bill of Rights provides that "[a]l persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." The Kansas Supreme Court traditionally construed the protections of Section 18 to be the same as those guaranteed by the Fourteenth Amendment to the United States Constitution.  *Murphy v. Nelson*, 921 P.2d 1225, 1232 (Kan. 1996).

137.    For the same reasons stated above, S.B. 28 is also void for vagueness under Section 18 of the Kansas Bill of Rights.

## FIFTH CLAIM FOR RELIEF

### *Declaratory/Injunctive Relief – Kansas Const., art. 2, § 16*

138.    AbbVie re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this complaint as though set forth fully herein.

139.    The Kansas Constitution limits legislative authority by providing that "[n]o bill shall contain more than one subject, except appropriation bills and bills for revision or codification of statutes." Kan. Const., art. 2 § 16.  Known as the "one-subject rule," this prohibition has existed since the time of Kansas' statehood to prevent a "form of legislative mischief called 'logrolling' in which unrelated matters that might not have enough support on their own are combined to entice the necessary votes to secure passage of the whole." *Kansas Nat'l Educ. Ass'n v. State*, 387 P.3d 795, 798 (Kan. 2017) (citing *Philpin v. McCarty, Supt.*, 24 Kan. 393, 402 (1880) ("Offtimes a matter of merit and commanding general confidence was yoked to something unworthy, and by this union the latter was carried through on the strength of the former.")).

140.    Private parties, like AbbVie, have standing to challenge legislative enactments under the "one-subject rule." *See Kansas Nat'l Educ. Ass'n*, 387 P.3d at 802.  In *Kansas National Educational Association*, the Kansas Supreme Court concluded standing had been satisfied because "a cognizable injury can be inferred from the allegation that [the Association's] members lost 'valuable rights' as a result of the statutory amendment." *Id.*  So too here.  AbbVie has a property interest in its drugs, and that interest—a "valuable right[]"—is impaired or otherwise lost as a result of S.B. 28's amendment of the Kansas Consumer Protection Act.  *See id.*

141.    S.B. 28 is an omnibus appropriations bill totaling 267 pages, and "making and concerning appropriations for fiscal years ending June 30, 2024, June 30, 2025, June 30, 2026, June 30, 2027, and June 30, 2028, for state agencies." S.B. 28 (Preamble).

142. The 340B restrictions AbbVie now challenges are found within the Attorney General's appropriations. S.B. 28 either contains specific limitations of funds: $1,000,000 set to fund "natural gas litigation," (S.B. 28, § 31 (a)); an increase in the budget of the crime victims compensation fund from $536,550 to $692,143 (§ 31 (c)); and a general operating expenditure budget of $8,651,956 (§ 32 (a)). Or it prescribes "no limit" for certain funds and expenses. (§ 32 (b) (setting "no limit" for the "coronavirus relief fund").

143. Sections 32(g) and 33, however, differ from the other myriad provisions in S.B. 28, and create affirmative new prohibitions and affect individuals' substantive rights, in the guise of a directive that "expenditures shall be made" by the Kansas Attorney General "to enforce the provisions of the Kansas consumer protection act [sic]" for the enumerated conduct by "manufacturer[s]."

144. Where an appropriations bill amends other substantive law or contains an action that is not an item of appropriation of money, it violates the one-subject rule. *Carlin*, 230 Kan. at 256, 258. The Kansas Supreme Court has previously rejected an attempt by the legislature "to include within those appropriation bills amendments to general legislation, wholly unrelated to the setting apart of state funds and the authorization of the expenditure thereof for specific purposes." *Id.* at 673.

145. S.B. 28 similarly does not fit the exception laid out in *Kansas National Education Association*. There, the Kansas Supreme Court held that an appropriations bill may sometimes contain amendments to the general legislation "so long as those provisions address a single subject." 387 P.3d at 808. The bill at issue in that case, H.B. 2506, entitled "[an act] concerning education," *id.* at 750, contains appropriations related to Kansas' educational systems, and included substantive reforms to the statutory protections against educators termination or non-

renewal of their contracts.  The Kansas Supreme Court ultimately concluded that all the provisions in the bill were "connected to [the] broad topic" of education, therefore H.B. 2506 had been properly passed.  *Id.* at 808–09. By contrast, S.B. 28 is an omnibus appropriations bill seeking to set budgetary limits and appropriate money for a myriad of Kansas state agencies, ranging from the Attorney General to the Kansas Board of Barbering, State Board of Veterinary Examiners, Kansas Highway Patrol, and Wichita State University to name a few.  Clearly, if S.B. 28 has a "single subject" it is appropriating money, not regulating the conduct of pharmaceutical manufacturers.

146.    S.B. 28's attempt to regulate the substantive conduct of manufacturers within the confines of an omnibus appropriations bill violates the Kansas Constitution's "one-subject rule." Kan. Const. art. 2, § 16.

**PRAYER FOR RELIEF**

**WHEREFORE,** AbbVie prays for the following relief:

a.      A declaration, order, and judgment declaring that S.B. 28 effects an impermissible taking of AbbVie's property for private benefit;

b.      A declaration, order, and judgment holding S.B. 28 unlawful because it is preempted by federal law and unconstitutional under the Supremacy Clause;

c.      A declaration, order, and judgment declaring that S.B. 28 violates the Due Process Clause;

d.      A declaration, order, and judgment holding that S.B. 28 violates the Kansas Constitution's "single-subject" rule.

e.      A declaration, order, and judgment holding that the 340B statute does not require drug manufacturers to provide 340B pricing to contract pharmacies or transfer or

cause their discounted covered outpatient drugs to be transferred to contract pharmacies;

f.     A preliminary and permanent injunction enjoining the Kansas Attorney General from enforcing S.B. 28;

g.     An award of all costs and attorneys' fees pursuant to any applicable statute or authority; and

h.     Any other relief that this Court deems just and proper.

Dated: July 1, 2024                          Respectfully submitted,

                                             /s/ Lynn D. Preheim
Ashley C. Parrish (*pro hac vice* forthcoming)     Lynn D. Preheim, #13300
John D. Shakow (*pro hac vice* forthcoming)        Nanette Turner Kalcik, #24030
KING & SPALDING LLP                          STINSON LLP
1700 Pennsylvania Avenue N.W.                 1625 N. Waterfront Parkway, Suite 300
Suite 900                                    Wichita, KS  67026
Washington, D.C. 20006                       Telephone: (316) 265-8800
Telephone: (202) 626-2627                    Fax:  (316) 265-1349
Email: aparrish@kslaw.com                    Email: lynn.preheim@stinson.com
                                                    Nanette.kalcik@stinson.com
Nicole Bronnimann (*pro hac vice*
forthcoming)                                 Matthew S. Owen, P.C. (*pro hac vice* forthcoming)
KING & SPALDING LLP                          Meredith M. Pohl (*pro hac vice* forthcoming)
1100 Louisiana, Suite 4100                   KIRKLAND & ELLIS LLP
Houston, TX 77002                            1301 Pennsylvania Avenue N.W.
Telephone: (713) 276-7402                    Washington, D.C. 20004
Email: nbronnimann@kslaw.com                 Telephone: (202) 389-5000
                                             Email: matt.owen@kirkland.com
                                                    meredith.pohl@kirkland.com

                                             *Counsel for Plaintiffs.*